**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

SEP 2 0 2024

TAMMY H. DOWNS, CLERK
By:_____
DEP CLERK

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

JULIE RITCHEY, on behalf of herself and
all others similarly situated,

Plaintiff,

v.

**EVOLVE BANK AND TRUST**

Defendant.

Civil Action No.: 4:24-cv-806-JM

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

This case assigned to District Judge **Moody**
and to Magistrate Judge **Kearney**

Plaintiff Julie Ritchey, by and through the undersigned counsel, brings this class action

complaint against Defendant Evolve Bank and Trust ("Evolve" or "Defendant"), on behalf of

herself and all others similarly situated. Plaintiff makes the following allegations based upon

personal knowledge as to her own actions and upon information and belief as to all other matters:

**INTRODUCTION**

1.       Plaintiff brings this class action against Defendant for its failure to properly

secure and safeguard the personally identifiable information ("PII") of approximately 7,640,112

individuals[1], including their names, dates of birth, Social Security numbers, driver's license

numbers, federal/state identification card numbers, tax identification numbers, addresses, phone

numbers, email addresses, bank account numbers, and other financial account information (the

"Data Breach"). The affected individuals include Evolve's direct customers and the customers of

---

[1] *See* Office of the Maine Attorney General Data Breach Notifications,
https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/a2e61e38-f78d-403d-9abb-3810771bb5d2.html (last visited July 22, 2024).

Evolve's current and former financial technology ("fintech") partners, whom Defendant refers to as "end users."[2]

2.      Defendant is a full-service financial services company that specializes in payment processing solutions and banking. Defendant accepts deposits, makes loans, and provides mortgage solutions, card facilities, and online banking services. Defendant also works with fintech companies by providing banking services to its fintech partners' customers – the end users.

3.      Plaintiff's and Class Members' PII was collected and maintained on Defendant's systems. Defendant failed to encrypt or redact the PII it collected from Plaintiff and Class Members.

4.      Plaintiff's and Class Members' PII was compromised, accessed, and unlawfully stolen in the Data Breach and has now been released to the dark web.

5.      The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect its customers' and end users' PII from a foreseeable and preventable cyber-attack.

6.      Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' PII was a known risk to Defendant, and thus, Defendant was on notice that failing to take steps necessary to secure the PII from those risks left that property in a dangerous condition.

---

[2] Defendant refers to the customers of its current and former fintech partners, such as Plaintiff, as "end users." Accordingly Plaintiff and other affected customers of Defendant's current and former fintech partners are referred to throughout this complaint as "end users" as well.

7.    Plaintiff's and Class Members' identities are now at a heightened risk of exposure because of Defendant's negligent conduct since the PII that Defendant collected and maintained is now in the hands of data thieves.

8.    Armed with the PII exfiltrated in the Data Breach, data thieves can use the PII obtained from Defendant to commit a variety of crimes, including credit/debit card fraud, tax fraud, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to set up utility accounts, using Class Members' information to target other phishing and hacking intrusions, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

9.    The risks associated with identity theft are serious.  While some identity theft victims can resolve their problems quickly, others spend hundreds of dollars and many days repairing damage to their good name and credit record.  Some consumers victimized by identity theft may lose out on job opportunities, or be denied loans for education, housing or cars because of negative information on their credit reports.  In rare cases, they may even be arrested for crimes they did not commit.

10.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes.

11.    As a direct result of the Data Breach, Plaintiff and Class Members have suffered fraud and will continue to be exposed to a heightened and imminent risk of fraud and identity

theft, potentially for the rest of their lives.  Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

12.     Plaintiff and Class Members may also incur out-of-pocket costs for purchasing credit monitoring services, identity theft protection services, credit freezes, credit reports, and other protective measures to deter and detect identity theft.

13.     As a direct and proximate result of the Data Breach and subsequent exposure of their PII, Plaintiff and Class Members also suffered additional ascertainable losses, including, but not limited to, a loss of the value of their private and confidential information, and the loss of the benefit of their contractual bargain with Defendant.

14.     As a direct and proximate result of the Data Breach and subsequent exposure of their PII, Plaintiff and Class Members have suffered, and will continue to suffer damages and economic losses in the form of lost time needed to take appropriate measures to avoid unauthorized and fraudulent charges, putting alerts on their credit files, and dealing with spam phone calls, letters, and emails received as a result of the Data Breach.

15.     As a direct and proximate result of the Data Breach and subsequent exposure of their PII, Plaintiff and Class Members have suffered, and will continue to suffer, an invasion of their property interest in their own PII such that they are entitled to damages from Defendant for unauthorized access to, theft of, and misuse of their PII.  These harms are ongoing, and Plaintiff and Class Members will suffer from future damages associated with the unauthorized use and misuse of their PII as thieves will continue to use the information to obtain money and credit in their names for several years.

16.     Plaintiff seeks to remedy these harms on behalf of all similarly situated individuals whose PII was accessed via the Data Breach and/or compromised by Defendant during the Data Breach.

17.     Defendant is responsible for the Data Breach because Defendant failed to implement reasonable security procedures and practices and failed to disclose material facts surrounding its deficient security protocols.

18.     As a result of Defendant's failure to protect the sensitive information it was entrusted to safeguard, Plaintiff and Class members did not receive the benefit of their bargain with Defendant and now face a significant risk of financial fraud, and other identity-related fraud now and into the indefinite future.

## PARTIES

19.     Plaintiff Julie Ritchey is a citizen and resident of Ohio.  Plaintiff provided her PII to Defendant in connection with her personal account and credit card with point-of-sale installment loan company, Affirm Holdings, Inc. ("Affirm").  Affirm is one of Defendant's fintech partners.

20.     Defendant Evolve Bank and Trust is an Arkansas corporation with its principal place of business located at 6000 Poplar Ave. #300, Memphis, TN 38119.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million exclusive of interest and costs. There are more than 100 putative class members and at least some members of the proposed Class, including Plaintiff, have a different citizenship from Defendant. This Court

has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because all claims alleged herein form part of the same case or controversy.

22.     This Court has jurisdiction over Defendant because Defendant is an Arkansas corporation and/or is authorized to and does conduct business in this District.

23.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) (1) & (2) because a substantial part of the events and omissions giving rise to this action occurred in and emanated from this District.

## FACTUAL ALLEGATIONS

24.     Defendant claims to be a "national best in class financial services institution that combines the expertise of a bank and the power of technology to offer our clients unique profitable solutions."[3]

25.     Defendant's software services are specialized for financial and banking providers who oversee highly sensitive data. Defendant thus must oversee, manage, and protect the PII of clients of Defendant's customers – the end users.

26.     In the ordinary course of its business, Defendant collected and maintained the PII of its customers and end users, including their names, dates of birth, Social Security numbers, state/federal identification numbers, tax identification numbers, addresses, emails, phone numbers, bank account numbers, linked account numbers, debit card numbers, and other PII.

27.     In the course of collecting PII from customers and end users Defendant promised to provide confidentiality and adequate security for customer data through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

---

[3] Evolve, About us, https://www.getevolved.com/about-us/about-evolve/ (last visited July 15, 2024).

6

28.     In response to the question "How does Evolve Bank & Trust protect my personal information?", Defendant's Privacy Policy provides that "[t]o protect your personal information from unauthorized access and use, we use security measures that comply with federal law … include[ing] computer safeguards and secured files and buildings."[4]

29.     Despite recognizing its duty to do so, Defendant has not implemented reasonable cybersecurity safeguards or policies to protect consumers' PII or supervised its IT or data security agents and employees to prevent, detect, and stop breaches of its systems. As a result, Defendant leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to consumers' PII.

### *Defendant's Data Collection and Privacy Practices*

30.     Defendant offers various financial services to its customers and end users, including banking services and money transfer services.

31.     Defendant acquires, collects, and stores a massive amount of PII on its customers and end users, such as Plaintiff and Class Members.

32.     As a condition of obtaining financial services from Defendant, whether directly or through one of Defendant's fintech partners, Plaintiff and Class Members were required to give their sensitive and confidential PII to Defendant.

33.     Defendant collects, retains, and stores consumers' PII as part of its business model, and in the regular course of business.  This information is retained not only to facilitate the delivery of financial services by Defendant, but also to serve Defendant's business interests and generate profits, including the selling and sharing of consumers' personal information.

---

[4] *See* Evolve Bank & Trust, What Does Evolve Bank & Trust Do With Your Personal Information? (Dec. 2022), https://www.getevolved.com/wp-content/uploads/2023/03/Evolve-Consumer-Privacy-Policy-Notice-12-22-Final.pdf (last visited July 17, 2024).

34.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties to Plaintiff and the Class Members and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

35.     Given Defendant's representations and experience handling PII, Defendant understood the need to protect Plaintiff's and Class Members' PII entrusted to it and prioritize data security.

36.     Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.  Plaintiff and Class Members would not have entrusted their PII to Defendant absent a promise to safeguard that information.

37.     Defendant had obligations created by the Federal Trade Commission Act ("FTC Act") (15 U.S.C. §45), contract, common law, and industry standards to keep Plaintiff's and Class Members' PII confidential and to protect it from unauthorized access and disclosure.

38.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information Defendant was maintaining for Plaintiff and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed.

### ***The Data Breach***

39.     On or about June 26, 2024 Defendant announced that it was "currently investigating a cybersecurity incident involving a known cybercriminal organization that appears

to have illegally obtained and released on the dark web the data and personal information of some

Evolve retail bank customers and financial technology partners' customers."[5]

40.     The initial Notice of Data Breach stated:

Evolve Bank & Trust is making retail bank customers and financial technology partners' customers (end users) aware of a cybersecurity incident that may involve certain personal information, as well as the actions we have taken in response, and additional steps individuals may take.

**What Happened**

Evolve is currently investigating a cybersecurity incident involving a known cybercriminal organization that appears to have illegally obtained and released on the dark web the data and personal information of some Evolve retail bank customers and financial technology partners' customers (end users). We take this matter extremely seriously and are working diligently to address the situation. Evolve has engaged the appropriate law enforcement authorities to aid in our investigation and response efforts. Based on what our investigation has found and what we know at this time, we are confident this incident has been contained and there is no ongoing threat.

**What Information Was Involved**

It appears these bad actors have released illegally obtained data, including Personal Identification Information (PII), on the dark web. The data varies by individual but may include your name, Social Security Number, date of birth, account information and/or other personal information.

**What We Are Doing**

We are beginning the long process of communicating with customers and financial technology partners' customers (end users) who have been affected by this incident. If you are an impacted retail bank customer, you will receive an email from notifications@getevolved.com. If you are a financial technology partner, banking app customer (end user) you will receive an email directly from your provider. The email will include detailed instructions on how to enroll in complimentary credit monitoring with identity theft detection services.[6]

41.     As of July 1, 2024, the updated *Notice of Data Breach* reads, in part:

**What Happened**

In late May 2024, Evolve Bank & Trust identified that some of its systems were not working properly. While it initially appeared to be a hardware failure, we subsequently learned it was unauthorized activity. We engaged cybersecurity

---

[5] This version has since been archived by Defendant.

[6] Notice of Data Breach (July 9, 2024), https://www.getevolved.com/about/news/cybersecurity-incident/.

specialists to investigate and determined that unauthorized activity may have been the cause. We promptly initiated our incident response processes, stopped the attack within days, and have seen no new unauthorized activity since May 31, 2024. We engaged outside specialists to investigate what happened and what data was affected, as well as a firm to help us restore our services. We reported this incident to law enforcement.

While the investigation is ongoing, we want to share some important information about what we know so far. At this time, current evidence shows the following:

> • *This was a ransomware attack by the criminal organization, LockBit.*

> • They appear to have gained access to our systems when an employee inadvertently clicked on a malicious internet link.

> • There is no evidence that the criminals accessed any customer funds, but *it appears they did access and download customer information from our databases and a file share during periods in February and May.*

> • The threat actor also encrypted some data within our environment. However, we have backups available and experienced limited data loss and impact on our operations.

> • We refused to pay the ransom demanded by the threat actor. *As a result, they leaked the data they downloaded.* They also mistakenly attributed the source of the data to the Federal Reserve Bank. (Emphasis added.)[7]

42.    Omitted from the notice were details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. These omitted details have not been provided to Plaintiff and Class Members.

43.    LockBit, which allegedly attacked Defendant and caused the Data Breach, is a well-known ransomware gang with a reputation as a notorious extortion group.[8]

44.    In April 2020, ZDNet reported, in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year," that *"[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies.* They breach networks, use specialized tools to

---

[7] *Id.* (emphasis added).
[8] *See* Dark Web Profile: LockBit 3.0 Ransomware (Aug. 31, 2023), https://socradar.io/dark-web-profile-lockbit-3-0-ransomware/.

maximize damage, *leak corporate information on dark web portals*, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[9]

45.     In September 2020, the United States Cybersecurity & Infrastructure Security Agency ("CISA") published online a "Ransomware Guide" advising that *"[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data* if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[10]

46.     According to Blackberry, "LockBit establishes control of a victim's system, collects network information, and achieves primary goals such as stealing and encrypting data. LockBit attacks typically employ a double extortion tactic to encourage victims to pay, first, to regain access to their encrypted files, and then to pay again to prevent their stolen data from being posted publicly."[11]

47.     LockBit ransomware has been implicated in more cyberattacks this year than any other ransomware, making it the most active ransomware in the world.

48.     It should not have come as a surprise to Defendant that LockBit ransomware gang would target it. Yet, Defendant failed to take basic precautions to prevent the Data Breach.

---

[9] ZDNet, Ransomware mentioned in 1,000+ SEC filings over the past year (Apr. 30, 2020) https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/ (emphasis added).
[10] U.S. CISA, Ransomware Guide-September 2020, available at https://www.cisa.gov/stopransomware/ransomware-guide (last visited July 19, 2024).
[11] Blackberry, "What Is LockBit Ransomware?", https://www.blackberry.com/us/en/solutions/endpoint-security/ransomware-protection/lockbit (last accessed July 19, 2024).

49.     Industry publication TechCrunch reported that, among others, fintech companies Affirm, Branch, EarnIn, Marqueta, Melio, Mercury, Yieldstreet and Wise were affected by the Data Breach, and their customers' PII may have been stolen.[12]

50.     Jason Mikula, a fintech reporter, wrote on June 20, 2024, that "The situation at Evolve Bank & Trust, which powers dozens of fintech programs with millions of end users, went from bad to worse last week." While Defendant was "still struggling to deal with the fallout from the bankruptcy and reconciliation issues linked to one-time banking-as-a-service partner Synapse", the bank was hit with "what may be one of the widest-reaching public data breaches in US history." Mr. Mikula reported that the Data Breach involved the exfiltration of some 33 terabytes of data equivalent to some 2.8 billion pages of text.[13]

51.     Mr. Mikula noted that Defendant is "arguably the most prolific partner bank supporting fintech programs" and has "powered services or capabilities" for the following firms, all of which have likely lost their clients' PII in the Data Breach: Affirm, Airwallex, Alloy, Apto Payments, Asset Lab, B9, Bilt Rewards, BlockFi (bankrupt), Bond (BaaS platform acquired by FIS), Branch (powers instant payout and EWA programs for major business like Uber and Fetch and franchise operators of brands like Pizza Hut, Jimmy John's, and Dunkin Donuts), Brightside, Bufipay, Bushel Exchange, ByteFederal, Cadre, ChangeFi, Clearing, Dave, Deserve (credit card-as-a-service platform), EarnIn, EquityZen, eusoh, Every, Extra, Finch Money, FloatMe, Flycoin, FTX (bankrupt), Gerald, Grid, GigWage, GloriFi (shutdown), GoChanged, GravyStack, Hightop,

_____

[12] Lorenzo Franceschi-Bicchierai, "Yieldstreet says some of its customers were affected by the Evolve Bank data breach" TechCrunch (July 2, 2024), online: https://techcrunch.com/2024/07/02/yieldstreet-says-some-of-its-customers-were-affected-by-the-evolve-bank-data-breach/ (last accessed September 17, 2024).

[13] Jason Mikula, "Evolve Hack Crisis: Russia-Linked cybergang Leaks Records on Millions" Fintech Business Weekly (June 30 ,2024), https://fintechbusinessweekly.substack.com/p/evolve-hack-crisis-russia-linked.

Juno, Kyshi, Lumanu, Melio, Mercury, Nomad, Paceline, Palolo, PayGears, Paystand, PrideCard, PrizePool, Profit Business Bank, Qoins, RBR, RelayFi, Rho, Rollfi, Sail, Save, Series Financial, Shopify (via Stripe Treasury), Sila (payment processing platform), Sila, Solid (banking-as-a-service platform), SoLo Funds, Starlight, Status Money (shutdown), Step, Stilt (acquired by JG Wentworth), Stripe Treasury, Swype, Synapse (ongoing bankruptcy), TabaPay, TeamUP, Unbanked, Wise (until late 2023), YieldStreet, Yorbis, ZELF, and Zirtue.[14]

52.     Defendant's poor cybersecurity practices are long-standing and led to regulatory action against Defendant.  The St. Louis Federal Reserve Bank and the Arkansas State Banking Department launched a "wide ranging enforcement action" against Defendant, stemming from their 2023 safety and soundness examination. The enforcement action mandated "a plan and timetable to correct information technology security deficiencies."[15]

53.     In addition, on June 11, 2024, the U.S. Federal Reserve Board ordered Defendant to "cease and desist" after a 2023 audit noted deficiencies in its anti-money laundering, risk management, and consumer compliance programs.[16]

54.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to more than seven million individuals' detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

---

[14] *Id.*

[15] Jason Mikula, "Evolve Hit with Fed Enforcement Action, But Why Did It Take This Long?" Fintech Business Weekly, *supra.*

[16] *See* Cameron Emanuel-Burns, *US Federal Reserve Board issues cease and decist order against Evolve Bank*, FintechFutures (June 18, 2024), https://www.fintechfutures.com/2024/06/us-federal-reserve-board-issues-cease-and-desist-order-against-evolve-bank/.

55.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

### *The Financial Sector Is Particularly Susceptible to Cyberattacks*

56.     Defendant was or should have been on notice that data breaches perpetuated against financial institutions that collect, store, and maintain PII, like Defendant, have become widespread.

57.     The number of U.S. data breaches surpassed 1,000 in 2016, a forty percent increase in the number of data breaches from the previous year.[17]   In 2022, 1,802 data compromises were reported that impacted over 422 million victims—marking a 42% increase in the number of victims impacted since 2021.[18]  That upward trend continues.

58.     In the first quarter of the 2024 fiscal year alone, 841 organizations experienced data breaches, resulting in 28,596,892 individuals' personal information being compromised.[19] Further, 224 of the organizations that experienced data breaches were financial services institutions.[20]

---

[17] Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout, CISION PR NEWSWIRE (Jan. 19, 2017), https://www.prnewswire.com/news-releases/data-breaches-increase-40-percent-in-2016-finds-new-report-from-identity-theft-resource-center-and-cyberscout-300393208.html.

[18] 2022 Annual Data Breach Report, Identity Theft Resource Center (Jan. 2023), https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final-1.pdf.

[19] *See* Identity Theft Resource Center, *Identity Theft Resource Center Q12024 Data Breach Analysis: Compromises Up 90 Percent Over Q1 2023* (Apr. 10, 2024),   https://www.idtheftcenter.org/wp-content/uploads/2024/04/ITRC-O 1-2024-Data-BreachAnalysis-l.pdf.

[20] *Id.*

59.     As the number of data breaches has increased, so has the rate of identity theft complaints.  For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[21]

60.     Banks and financial services companies, such as the Defendant, are especially attractive targets for ransomware. A Conference of State Bank Supervisors document warned that "**[r]ansomware continues to present a major threat to the financial sector**. This method of attack used by bad actors has evolved from the basic encryption of data to now include variations utilizing double and triple extortion, as well as distributed denial of service attacks (DDoS). For the financial sector, ransomware is much more than a financial issue of paying a ransom or a fee to recover stolen data. **Ransomware also represents an operational threat and, in some instances, a threat to the very survival of the institution**. "[22]

61.     Data thieves regularly target companies like Defendant's due to the highly sensitive information that they keep in their custody.  Defendant knew and understood that unprotected PII is valuable and highly sought after by criminals who seek to illegally monetize that PII through unauthorized access, sale and use of the PII.

62.     Cyber-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack.[23]

---

[21] Facts + Statistics: Identity Theft and Cybercrime, INSURANCE INFORMATION INSTITUTE, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (last visited July 17, 2024).
[22] Conference of State Bank Supervisors, "Ransomware: Lessons Learned by Banks That Suffered an Attack", https://www.dob.texas.gov/sites/default/files/files/Bank-Trust-Companies/Ransomware-Lessons-Learned-Banks.pdf (last accessed July 19, 2024), emphasis added.
[23] *See* Ben Kochman, *RBI, Secret Service Warn of Targeted Ransomware*, Law360 (Nov. 18, 2019), https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-a0l55a8bb5l&utm.

63.     Additionally, as companies became more dependent on computer systems to run their business,[24] *e.g.,* working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[25]

64.     Defendant knew and understood unprotected or exposed PII in the custody of financial institutions, like Defendant, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that PII through unauthorized access.

65.     As a financial institution in custody of customers' and end users' PII, Defendant knew, or should have known, the importance of safeguarding PII entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

### ***The Data Breach was Preventable***

66.     Defendant's cybersecurity practices and policies were inadequate and fell short of the industry-standard measures that should have been implemented long before the Data Breach occurred. This is especially true given the financial sector is frequently targeted for cyberattacks. Attacks using stolen credentials have increased precipitously over the last several years.

67.     This was known and obvious to Defendant as Defendant observed frequent public announcements of data breaches affecting companies that, like Defendant, collected and

---

[24] *See* Danny Brando, et al., *Implications of Cyber Risk for Financial Stability*, FEDS Notes, Board of Governors of the Federal Reserve System (May 12, 2022), https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html.
[25] *See* Suleyman Ozarslan, *Key Threats and Cyber Risks Facing Financial Services and Banking Firms in 2022*, Picuz Security (Mar. 24, 2022), https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022.

maintained significant amounts of PII, and knew that information of the type they collected, maintained, and stored is highly coveted and a frequent target of hackers.

68.     It is well known that use of stolen credentials has long been the most popular and effective method of gaining authorized access to a company's internal networks and that companies should activate defenses to prevent such attacks.

69.     According to the Federal Bureau of Investigation (FBI), phishing schemes designed to induce individuals to reveal personal information, such as network passwords, were the most common type of cybercrime in 2020, with such incidents nearly doubling in frequency between 2019 and 2020.[26]

70.     There are two primary ways to mitigate the risk of stolen credentials: user education and technical security barriers.

71.     User education is the process of making employees or other users of a network aware of common disclosure schemes and implementing company-wide policies requiring the request or transfer of sensitive personal or financial information only through secure sources to known recipients.

72.     Companies can also greatly reduce the flow of fraudulent e-mails by installing technical security barriers including software that scans all incoming messages for harmful attachments or malicious content and implementing certain security measures governing e-mail transmissions, including Sender Policy Framework (SPF) (e-mail authentication method used to prevent spammers from sending messages on behalf of a company's domain), DomainKeys Identified Mail (DKIM) (e-mail authentication method used to ensure messages are not altered

---

[26] *2020 Internet Crime Report*, FBI, https://www.ic3.gov/Media/PDF/AnnualReport/2020_IC3Report.pdf (last visited July 25, 2024).

in transit between the sending and recipient servers), and Domain-based Message Authentication, Reporting and Conformance (DMARC), which "builds on the widely deployed [SPF] and [DKIM] protocols, adding a reporting function that allows senders and receivers to improve and monitor protection of the domain from fraudulent email."[27]

73.      CISA recommends that organizations take the following measures to detect cyber-attacks and prevent unauthorized access:

- Mitigating the risk of stolen credentials

- Conducting regular vulnerability scanning to identify and address vulnerabilities, particularly on internet-facing devices;

- Regularly patching and updating software to latest available versions, prioritizing timely patching of internet-facing servers and software processing internet data;

- Ensuring devices are properly configured and that security features are enabled;

- Employing best practices for use of Remote Desktop Protocol (RDP) as threat actors often gain initial access to a network through exposed and poorly secured remote services; and

- Disabling operating system network file sharing protocol known as Server Message Block (SMB) which is used by threat actors to travel through a network to spread malware or access sensitive data.[28]

74.      The CISA guidance further recommends use of a centrally managed antivirus software utilizing automatic updates that will protect all devices connected to a network (as opposed to requiring separate software on each individual device), as well as implementing a real-time intrusion detection system that will detect potentially malicious network activity that occurs prior to ransomware deployment.[29]

---

[27] *#StopRansomware Guide*, https://www.cisa.gov/stopransomware/ransomware-guide (last visited July 19, 2024).
[28] *Id.*
[29] *Id.*

75.     Indeed, had Defendant implemented common sense security measures like network segmentation and POLP, the hackers never could have accessed the PII exfiltrated in the Data Breach and the breach would have been prevented or much smaller in scope.

76.     Defendant also lacked the necessary safeguards to detect and prevent phishing attacks and failed to implement adequate monitoring or control systems to detect the unauthorized infiltration after it occurred.

77.     Defendant, like any entity in the financial sector storing valuable data, should have had robust protections in place to detect and terminate a successful intrusion long before access and exfiltration could expand to millions of consumer files. Defendant's procedures and policies were below industry-standards and are inexcusable given Defendant's knowledge that they were a prime target for cyberattacks.

### *Allegations Relating to Plaintiff*

78.     Plaintiff is a customer of Affirm Holding, Inc. ("Affirm").  Affirm is a point-of-sale installment loan company which, among other services, facilitates the issuance of the Affirm Card, a debit card that can be used physically or virtually and which allows consumers to link a bank account to pay in full, or apply to pay for a purchase over time through the Affirm App. Affirm began partnering with Defendant in 2021, and is currently partnered with Defendant to provide debit card issuing services to Affirm customers.

79.     Plaintiff has been a customer of Affirm since December 2021 and received an Affirm Card in April 2024.

80.     Defendant is Affirm's sole card issuing bank partner for the Affirm Card.  For Defendant to issue Affirm Cards to Affirm customers, Defendant required Affirm to share certain identifying information of end users with Defendant, which Defendant then held in its possession.

The information Affirm was required to share with Defendant included the name, address, date of birth, contact details, and social security number associated with each Affirm account.

81.     Plaintiff provided her PII to Affirm for her personal account, who then provided her PII to Defendant, including her name, date of birth, Social Security number, and contact information.

82.     As part of her involvement with Defendant, Plaintiff entrusted her PII to Defendant with the reasonable expectation and understanding that Defendant would take, at a minimum, industry standard precautions to protect, maintain, and safeguard that information from unauthorized use or disclosure, and would timely notify her of any data security incidents related to her personal account with Affirm.  Plaintiff would not have permitted her PII to be given to Defendant had she known Defendant would not take reasonable steps to safeguard her PII.

83.     Affirm was a fintech partner with Defendant at the time of the Data Breach.

84.     On July 30, 2024, Plaintiff received an email from Affirm notifying her that her PII, which had been provided to Defendant, had been improperly accessed and taken by unauthorized third parties:

> We are following up on the recent cybersecurity incident at Evolve Bank and Trust ("Evolve"), a third-party vendor that serves as an issuing partner on the Affirm Card.
>
> You may receive a notification from Evolve with more details. Evolve also has additional information included on their website here. However, we feel it's important that you hear from us directly and are aware of the resources available to you.
>
> To summarize, a cybercriminal organization illegally accessed and obtained some personal information about Evolve retail bank's customers and those of its financial technology partners, which include Affirm. For Affirm Card users, this means that your personal information may have been inappropriately accessed as a result of this incident.

85.     On August 5, 2024, Plaintiff received an email from Defendant notifying her that her PII was compromised in the Data Breach:

**What happened?**

On May 29, 2024, Evolve identified that some of its systems were not working properly. While it initially appeared to be a hardware failure, we subsequently learned it was unauthorized activity. Evolve promptly initiated its incident response processes and stopped the attack. No new unauthorized activity on Evolve's systems has been identified since May 31, 2024. An investigation with assistance from a cybersecurity firm was initiated to investigate what happened and what data may have been impacted. Evolve also notified law enforcement and worked to add further protections to harden its systems.

**What personal information was involved?**

There is no evidence that the threat actors accessed any customer funds, but it appears the threat actors did access and download customer information from Evolve's databases and a file share during periods in February and May 2024.

Within these downloaded files, Evolve identified the following personal data about you: Name, Contact Information, Evolve Account Number, Social Security Number and Date of Birth.

86.    According to the notices she received from Affirm and from Defendant, Plaintiff's name, contact information, social security number, date of birth, and Evolve account number were all compromised in the Data Breach.

87.    Plaintiff is very careful about sharing her sensitive PII. Plaintiff stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

88.    As a result of the Data Breach, Plaintiff made and will continue to make reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach, contacting credit bureaus to place freezes on her accounts, and signing up for the credit monitoring and identity theft protection services offered by Defendant. Plaintiff has spent significant time dealing with the Data Breach-valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

89.     As a result of the Data Breach, Plaintiff has suffered lost time, annoyance, interference, and inconvenience addressing and monitoring for adverse personal impacts caused by the Data Breach. This is time Plaintiff otherwise would have spent performing other activities.

90.     In addition, Plaintiff has suffered and will continue to suffer fear, anxiety, stress, and emotional distress as a result of the Data Breach, and has increased concerns for the loss of her privacy and the release of her PII, which she would not have suffered had Defendant implemented the necessary and proper safeguards to protect Plaintiff's and Class Members' PII from theft. These injuries have been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

91.     The PII that was accessed in the Data Breach was the kind of sensitive information that can be used to commit fraud and identity theft. It was reasonable and foreseeable that Plaintiff would take, and continue to take, necessary measures to protect her PII.

92.     Plaintiff has a continuing interest in ensuring that her PII, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from further and future breaches.

93.     Plaintiff suffered actual injury in the form of damages to and loss of value of her PII—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in, and as a result, of the Data Breach.

94.     As a result of the Data Breach, Plaintiff will continue to be at heightened risk for financial fraud, identity theft, and the attendant damages, for years to come.

### *The Value of PII and the Effects of Unauthorized Disclosure*

95.     At all relevant times, Defendant was well aware that the PII Defendant collects and maintains from Plaintiff and Class Members is highly sensitive and of significant value to those who would use it for wrongful purposes.

96.     PII is a valuable property right.[30] That PII has value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts, which include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

97.     The value of Private Information as a commodity is measurable.[31] "Firms are now able to attain significant market valuation by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks.[32] U.S. companies spent over $19 billion on acquiring the personal data of consumers in 2018.[33]

98.     An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[34] The data marketplace is so sophisticated

---

[30] *See* Mark Van Lieshout, The Value of Personal Data, 457 IFIP ADVANCES IN INFORMATION & COMMUNICATION TECHNOLOGY 25 (May 2015), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible ….").

[31] Robert Lowes, Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market, MEDSCAPE (Apr. 28, 2014), http://www.medscape.com/viewarticle/824192.

[32] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD (Apr. 2, 2013), https://www.oecd-ilibrary.org/scienceandtechnology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[33] U.S. Finns to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017, INTERACTIVE ADVERTISING BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

[34] *See* Ashiq Ja, Hackers Selling Healthcare Data in the Black Market, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/

that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[35]

99.     PII is also a valuable commodity to cyber attackers.  The U.S. Attorney General confirmed in 2020 that "hackers" target consumers' sensitive personal information because it "has economic value."[36]  Once PII has been compromised, criminals will use it and trade the information on the cyber black-market for years.

100.     Numerous sources cite dark web pricing for stolen identity credentials.[37]  For example, PII can be sold at a price ranging from $40 to $200.[38] Sensitive PII can sell for as much as $363 per record according to the Infosec Institute.[39]  Criminals can also purchase access to entire company data breaches from $900 to $4,500.[40]

101.     PII is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for years afterwards.

102.     As a result of their real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, Social Security numbers,

---

[35] *See* https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited July 15, 2024).
[36] *Attorney General William P. Barr Announces Indictment of Four Members of China's Military for Hacking into Equifax*, U.S. Dep't of Justice (February 10, 2020), https://www.justice.gov/opa/speech/attorney-general-william-p-barr-announces-indictment-four-members-china-s-military (last visited July 15, 2024).
[37] Your personal data is for sale on the dark web. Here's how much it costs, Digital Trends, Oct. 16, 2019, available at: https://www.digitaltrends.com/computing/personal-data-sold-on-the-darkweb-how-much-it-costs/ (last visited July 15, 2024).
[38] Here's How Much Your Personal Information Is Selling for on the Dark Web, Experian, Dec. 6, 2017, available at: https://www.experian.com/blogs/ask-experian/heres-how-much-yourpersonal-information-is-selling-for-on-the-dark-web/ (last visited July 15, 2024).
[39] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).
[40] *See* In the Dark, VPNOverview, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited July 15, 2024).

Private Information, and other sensitive information directly on various internet websites, making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated, and becomes more valuable to thieves and more damaging to victims.

103.    Social Security numbers are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiff and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[41]

104.    An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse.

105.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[42]

---

[41] Social Security Administration, Identity Theft and Your Social Security Number, available at: https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited July 15, 2024).
[42] Bryan Naylor, Victims of Social Security Number Theft Find It's Hard to Bounce Back, NPR (Feb. 9, 2015), available at: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-shackers-has-millionsworrying-about-identity-theft (last visited July 15, 2024).

106.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[43]

107.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

108.    The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used.

109.    According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[44]

110.    That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, and to take over victims'

---

[43] Tim Greene, Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers, IT World, (Feb. 6, 2015), available at: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10xprice-of-stolen-credit-card-numbers.html (last visited July 15, 2024).
[44] Report to Congressional Requesters, GAO, at 29 (June 2007), available at: https://www.gao.gov/assets/gao-07-737.pdf (last visited July 15, 2024).

identities to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

111.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

112.    As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been lost by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss.

### *Defendant Failed to Comply with FTC Guidelines*

113.    The Federal Trade Commission ("FTC") has issued numerous guides for business highlighting the importance of reasonable data security practices, which should be factored into all business-related decision making.[45]

---

[45] *Start with Security*, FTC, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited July 25, 2024).

114.     Defendant was prohibited by the FTC Act from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.[46]

115.     According to the FTC, the need for data security should be factored into all business decision-making.[47]

116.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses.[48] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

117.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable

---

[46] *See, e.g., In re Cap. One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 407 (E.D. Va. 2020) (citing *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015)).
[47] *Start With Security: A Guide for Business*, Fed. Trade Comm'n, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited July 25, 2024).
[48] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited July 25, 2024).

security measures.[49] This is consistent with guidance provided by the FBI, HHS, and the principles set forth in the CISA 2020 guidance.

118.    The FTC also states that outdated software undermines security, and recommends that software be updated regularly, third party patches be implemented as they are issued, and automated tools should be used to track which version of software is running and whether updates are available.[50]

119.    The FTC strongly encourages businesses to "[p]ut procedures in place to keep your security current and address vulnerabilities that may arise," including to "[c]heck expert websites (such as www.us-cert.gov) and your software vendors' websites regularly for alerts about new vulnerabilities, and implement policies for installing vendor-approved patches to correct problems." The FTC also cautions businesses to heed credible security warnings and move quickly to fix them. Businesses are strongly encouraged to "[h]ave an effective process in place to receive and address security vulnerability reports." [51]

120.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. §45.  These FTC enforcement actions include actions against financial companies, like Defendant.  *See, e.g.*, *In re Cap. One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 408 (E.D. Va. 2020).  Orders

---

[49] *Start With Security:  A Guide for Business*, Fed. Trade Comm'n, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited July 25, 2024).
[50] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited July 25, 2024).
[51] *Id.*

resulting from these actions further clarify the measures businesses must take to meet their data security obligations. [52]

121.     Defendant was fully aware of their obligation to implement and use reasonable measures to protect the PII it obtained from Plaintiff and Class Members but failed to comply with these basic recommendations and guidelines that would have prevented this breach from occurring. Defendant was also aware of the significant repercussions that would result from Defendant's failure to make good on those obligations.

122.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. §45.

### *Defendant Failed to Comply With Industry Standards*

123.     Several best practices have been identified that, at a minimum, should be implemented by financial institutions in possession of PII, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multifactor authentication; backup data and limiting which employees can access sensitive data. Defendant failed to follow these industry best practices, including a failure to implement multifactor authentication.

124.     Other best cybersecurity practices that are standard for financial institutions include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such

---

[52] *Privacy and Security Enforcement*, FTC, https://www.ftc.gov/news-events/topics/protecting-consumer-privacy-security/privacy-security-enforcement (last visited July 25, 2024).

as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

125.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-I, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-I, PR.DS-1, PR.DS-5, PR.PT-I, PR.PT-3, DE.CM-I, DE.CM-4, DE.CM-7, DE.CM-8, and RS.C0-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

126.    In addition, to prevent and detect cyber-attacks Defendant could and should have implemented, as recommended by CISA", the following measures:

- **Update and patch your computer.** Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransom ware attacks . ...

- **Use caution with links and when entering website addresses.** Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net) ....

- **Open email attachments with caution.** Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe.** Check a website's security to ensure the information you submit is encrypted before you provide it . ...

- **Verify email senders.** If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself.** Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs.** Install antivirus software, firewalls, and email filters-and keep them updated-to reduce malicious network traffic .. ..[53]

127.    To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls-including file, directory, and network share permissions-with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

---

[53] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), *available at:* https://us-cert.cisa.gov/ncas/tips/ST19-001 (last visited July 19, 2024).

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[54]

128.    To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**
- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**
- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**
- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

---

[54] *See* How to Protect Your Networks from RANSOMWARE, at 3-4, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited July 18, 2024).

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[55]

129.    The foregoing frameworks are established and applicable industry standards for data security, and upon information and belief, Defendant failed to comply with at least one—or all-of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

### *Cybercriminals Have and Will Continue to Use Plaintiff's and Class Members' PII for Nefarious Purposes*

130.    Plaintiff's and Class Members' PII is of great value to cybercriminals, and the data stolen in the Data Breach can be used in a variety of ways for criminals to exploit Plaintiff and the Class Members and to profit off their misfortune and stolen information.   The cybercriminals' motives for the Data Breach were purely nefarious and malicious in nature: their one goal was to access systems, including Defendant's systems, in order to obtain valuable PII to sell on the dark web.

---

[55] *See* Human-operated ransomware attacks:  A preventable disaster (Mar. 5, 2020), available at https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited July 18, 2024).

131.    Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan, change a billing address so the victim no longer receives bills, open new utilities, obtain a mobile phone, open a bank account and write bad checks, use a debit card number to withdraw funds, obtain a new driver's license or ID, and/or use the victim's information in the event of arrest or court action.

132.    Identity thieves can also use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, and/or rent a house or receive medical services in the victim's name.

133.    Even if stolen PII does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

134.    Criminals can also piece together bits and pieces of compromised PII for profit, for example by developing "Fullz" packages.[56]

---

[56] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of

135.    With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

136.    Then, this comprehensive dossier can be sold-and then resold in perpetuity-to crooked operators and other criminals (like illegal and scam telemarketers).

### ***Defendant Owed a Duty to Plaintiff and Class Members to Keep Their PII Secure and Protect It From Being Compromised, Lost, Stolen, Accessed, or Misused***

137.    In addition to their obligations under state laws and regulations, Defendant owed a common law duty to Plaintiff and Class Members to protect PII entrusted to it, including to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized parties.  This duty extends to Defendant's obligations to safeguard PII shared with subcontractors and service vendors who received PII from Defendant, and to conduct ongoing, robust due diligence into such subcontractors and service vendors prior to contracting and throughout any relationship.

138.    Defendant further owed and breached their duties to Plaintiff and Class Members to implement processes and specifications that would detect a breach of Defendant's security systems in a timely manner and to timely act upon warnings and alerts, including those generated

---

thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm,* Krebs on Security (Sep. 18, 2014) https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/ (last visited July 15, 2024).

by Defendant's own security systems. Instead of implementing such processes and specifications, Defendant allowed the Data Breach to go undetected for months before recognizing unusual activity.

139.    As a direct result of Defendant's intentional, willful, reckless, and negligent conduct which resulted in the Data Breach, cyber attackers were able to access, acquire, view, publicize, and/or otherwise cause the theft and misuse to Plaintiff's and Class Members' PII as detailed above, and Plaintiff is now at a heightened and ongoing risk of identity theft and fraud.

140.    The Data Breach was a direct and proximate result of Defendant's failure to: (a) properly safeguard and protect Plaintiff's and Class Members' PII from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class Members' PII; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

141.    Defendant had the resources necessary to prevent the Data Breach, but neglected to adequately implement data security measures, despite their obligation to protect Plaintiff's and Class Members' data.

142.    Had Defendant remedied the deficiencies in Defendant's data security systems and adopted security measures recommended by experts in the field, it would have prevented the intrusions into their systems and, ultimately, the theft of Plaintiff's and Class Members' PII.

### *Loss of Time to Mitigate Risk of Identity Theft & Fraud and Other Impacts of the Data Breach on Victims*

143.    Time is a compensable and valuable resource in the United States.

144.    As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach,

a reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet the resource and asset of time has been lost.

145.    Defendant, in its notice posted on its website, instructs Plaintiff and Class Members to remain vigilant by monitoring account activity and credit reports, set up fraud alerts, review credit reports, and file a report with the FTC.[57]

146.    Defendant's instruction that "all retail banking customers and financial technology partners' customers (end users)" should "remain vigilant by monitoring account activity and credit reports" establishes that Plaintiff's and Class Members' sensitive PII was in fact affected, accessed, compromised, and exfiltrated from Defendants' computer systems, and that Plaintiff and Class Members face an ongoing concrete, material, and imminent risk of harm as a result of the Data Breach.

147.    Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must, as Defendant's notice encourages them to do, monitor their financial accounts and otherwise take ongoing steps to mitigate the risk of fraud and identity theft for many years.

148.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach, contacting credit bureaus to place freezes on their accounts, and signing up for the credit monitoring and identity theft protection services offered by Defendant.

---

[57] *See* Evolve Bank & Trust Cybersecurity Incident (July 9, 2024), https://www.getevolved.com/about/news/cybersecurity-incident/ (last visited July 15, 2024).

149.     Plaintiff's mitigation efforts are consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach.[58]

150.     Many victims of the Data Breach have likely already experienced significant harms as the result of the Data Breach, including, but not limited to, identity theft and fraud. Plaintiff and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit monitoring services, reviewing financial statements, checking credit reports, and spending time and effort searching for unauthorized activity.

151.     It is no wonder then that identity theft exacts a severe emotional and physical toll on its victims.[59]

152.     The unauthorized disclosure of the PII to data thieves also deprives its owner of its value, which has been recognized by courts as an independent form of harm.[60]

153.     Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web is comprised of multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intend to use it for different fraudulent purposes.

---

[58] *See* Federal Trade Commission, Identity Theft.gov, https://www.identitytheft.gov/Steps (last visited July 15, 2024).
[59] *Identity Theft: The Aftermath 2017*, ITRC, https://www.idtheftcenter.org/wp-content/uploads/images/page-docs/Aftermath_2017.pdf (last visited July 25, 2024).
[60] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge— the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

154.    As the result of the wide variety of injuries that can be traced to the Data Breach, Plaintiff and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

a.  the unconsented disclosure of confidential information to a third party;

b.  losing the value of the explicit and implicit promises of data security;

c.  identity theft and fraud resulting from the theft of their PII;

d.  costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

e.  anxiety, emotional distress, and loss of privacy;

f.  costs associated with purchasing credit monitoring, credit freezes, and identity theft protection services;

g.  unauthorized charges and loss of use of and access to their financial and investment account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit;

h.  lowered credit scores resulting from credit inquiries following fraudulent activities;

i.  costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for

fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

j.    the continued, imminent, and certainly impending injury flowing from potential fraud and identify theft posed by their PII being in the possession of one or many unauthorized third parties.

155.    Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement.

156.    The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "[r]esolving the problems caused by identity theft [could] take more than a year for some victims."[61]

157.    Plaintiff and Class Members place significant value in data security. According to a survey conducted by cyber-security company FireEye Mandiant, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more in order to work with a provider that has better data security. Likewise, 70% of consumers would provide less personal information to organizations that suffered a data breach.[62]

---

[61] Erika Harrell, & Lynn Langton, *Victims of Identity Theft, 2012*, U.S. DEP'T OF JUST., OFF. OF JUST. PROGRAMS BUREAU OF JUST. STATS. (Dec. 2013), https://www.bjs.gov/content/pub/pdf/vit12.pdf.
[62] *Beyond the Bottom Line: The Real Cost of Data Breaches*, FireEye (Oct. 23, 2018), https://library.cyentia.com/report/report_001510.html.

158.    Had Plaintiff or Class Members known the truth about Defendant's data security practices—that it did not adequately protect and store their PII —they would not have entrusted Defendant with their PII. As such, Plaintiff and Class members did not receive the benefit of their bargain with Defendant.

159.    Plaintiff and Class members have a direct interest in Defendant's promises and duties to protect their PII, *i.e.*, that Defendant *not increase* their risk of identity theft and fraud. Because Defendant failed to live up to its promises and duties in this respect, Plaintiff and Class members seek the present value of identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by Defendant's wrongful conduct. Through this remedy, Plaintiff seeks to restore herself and Class Members as close to the same position as they would have occupied but for Defendant's wrongful conduct, namely Defendant's failure to adequately protect Plaintiff's and Class Members' PII.

160.    Plaintiff and Class members further seek to recover the value of the unauthorized access to their PII permitted through Defendant's wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PII is non-rivalrous—the unauthorized use by another does not diminish the rights- holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP—*i.e.*, a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate

because (a) Plaintiff and Class Members have a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, *i.e.*, evidence regarding the value of similar transactions.

161.    Because Defendant continue to hold the PII of Plaintiff and Class Members, Plaintiff and Class members have an undeniable interest in ensuring that their PII is secured, remains secure, and is not subject to further theft.

## CLASS ACTION ALLEGATIONS

162.    Plaintiff brings this class action on behalf of herself and all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3) and 23(c)(4) of the Federal Rules of Civil Procedure and Local Rule 23.1.

163.    **Class Definition**: The Class that Plaintiff seeks to represent is defined as follows:

   All individuals whose PII was compromised in the Evolve Data Breach.

164.    Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers, and directors, current or former employees, and any entity in which Defendant have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

165.    Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

166.   **Numerosity, Fed. R. Civ. P. 23(a)(1)**: The members of the Class are so numerous that joinder of all of them is impracticable. According to the breach report submitted to the Office of the Maine Attorney General, at least 7,000,000 Class Members were impacted in the Data Breach. The Class is apparently identifiable within Defendant's records, and Defendant has already identified these individuals.

167.   **Commonality and Predominance, Fed. R. Civ. P. 23(a)(2) and (b)(3)**: Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members.  These common questions of law and fact are such that there is a well-defined community of interest in this litigation. The common questions of law and fact include, without limitation:

    a.   Whether Defendant owed Plaintiff and Class Members a duty to implement and maintain reasonable security procedures and practices to protect their PII;

    b.   Whether Defendant violated their duty to implement reasonable security systems to protect Plaintiff's and Class Members' PII;

    c.   Whether Defendant's breach of their duty to implement reasonable security systems directly and/or proximately caused damages to Plaintiff and Class Members;

    d.   Whether Defendant owed a duty to Plaintiff and the Class to exercise due care in collecting, storing, safeguarding, and/or obtaining their PII;

    e.   Whether Defendant violated their duty to exercise due care in collecting, storing, safeguarding, and/or obtaining their PII;

f.   Whether Defendant's breach of their duty to exercise due care in collecting, storing, safeguarding, and/or obtaining their PII directly and/or proximately caused damages to Plaintiff and Class Members;

g.   Whether Defendant received a benefit without proper restitution making it unjust for Defendant to retain the benefit without commensurate compensation;

h.   Whether Defendant acted negligently in connection with the monitoring and/or protection of Plaintiff's and Class Members' PII;

i.   Whether Defendant adequately addressed and fixed the vulnerabilities that enabled the Data Breach;

j.   Whether Defendant and class members are entitled to damages to pay for future protective measures like credit monitoring and monitoring for misuse of PII;

k.   Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach; and

l.   Whether class members are entitled to compensatory damages, nominal damages, and/or punitive damages as a result of the Data Breach.

168.   **Typicality, Fed. R. Civ. P. 23(a)(3)**: Plaintiff's claims are typical of the claims of the members of the Class because all class members had their PII compromised in the Data Breach and were harmed as a result.

169.   **Policies Generally Applicable to the Class**: This class action is also appropriate for certification because Defendant have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class and making final injunctive relief appropriate with respect

to the Class as a whole. Defendant's policies challenged herein apply to and affect the Class uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

170.    **Adequacy, Fed. R. Civ. P. 23(a)(4)**: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no known interest antagonistic to those of the Class and her interests are aligned with Class Members' interests. Plaintiff was subject to the same Data Breach as class members, suffered similar harms, and face similar threats due to the Data Breach. Plaintiff has also retained competent counsel with significant experience litigating complex class actions, including data breach cases involving multiple classes and data breach claims.

171.    **Superiority and Manageability, Fed. R. Civ. P. 23(b)(3)**: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

172.    The nature of this action and the nature of laws available to Plaintiff and the Class make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the Class for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since Defendant would be able to exploit and overwhelm the

limited resources of the Class with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

173.    The litigation of the claims brought herein is manageable.  Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

174.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

175.    Unless a Class-wide injunction is issued, Plaintiff and Class Members remain at risk that Defendant will continue to fail to properly secure the PII of Plaintiff and Class Members resulting in another data breach, continue to refuse to provide proper notification to Class Members regarding the Data Breach, and continue to act unlawfully as set forth in this Class Action Complaint.

176.    Defendant acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

177.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would

advance the disposition of this matter and the parties' interests therein.  Such particular issues include, but are not limited to the following:

- Whether Defendant owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

- Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

- Whether Defendant failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

- Whether Defendant failed to implement and maintain reasonable and adequate security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach; and

- Whether Class Members are entitled to actual damages, additional credit monitoring or other injunctive relief, and/or punitive damages as a result of Defendant's wrongful conduct.

178.    **Class Identity**: The members of the Class are readily identifiable and ascertainable. Defendant and/or their affiliates, among others, possess the information to identify and contact class members.

## **CLAIMS FOR RELIEF**

### **COUNT I**
### **Negligence**
### *(On Behalf of Plaintiff and the Class)*

179.    Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 178 as though fully set forth herein.

180.    Defendant requires its customers and end users, including Plaintiff and Class Members, to provide their PII to Defendant in the ordinary course of providing its financial services.

181.    Defendant gathered and stored the PII of Plaintiff and Class Members as part of its business of soliciting its services to its customers, which solicitations and services affect commerce, as well as for its own financial gain.

182.    Plaintiff and Class Members entrusted Defendant with their PII with the understanding that Defendant would safeguard their information.

183.    Defendant knew, or should have known, of the risks inherent in collecting and storing the PII of Plaintiff and Class Members.

184.    As described above, Defendant owed duties of care to Plaintiff and Class Members whose PII had been entrusted with Defendant.

185.    The duties of care owed by Defendant include a duty to exercise reasonable care in protecting Plaintiff's and Class Members' PII from unauthorized disclosure or access.

186.    Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. See Restatement (Second) of Torts§ 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

187.    The duties of care owed by Defendant also include a duty to provide adequate data security, consistent with industry standards, to ensure that Defendant's systems and networks adequately protected Plaintiff's and Class Members' PII.

49

188.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove from an internet-accessible environment the PII, including former customers' and their end users' PII, it was no longer required to retain pursuant to regulations and had no reasonable need to maintain.

189.    Defendant breached its duty to exercise appropriate clearinghouse practices by failing to remove from the Internet-accessible environment any PII it was no longer required to retain pursuant to regulations and which Defendant had no reasonable need to maintain in an Internet-accessible environment.

190.    Defendant entered into a special relationship with Plaintiff and Class Members because Defendant collected the PII of Plaintiff and Class Members – information that Plaintiff and Class Members were required to provide in order to receive the financial services provided to them by Defendant.

191.    Defendant's duty to use reasonable care in protecting Plaintiff's and Class Members' PII arises as a result of the parties' relationship, as well as common law and federal law, including Defendant's own policies and promises regarding privacy and data security.

192.    Defendant breached their duty to Plaintiff and Class Members in numerous ways, as described herein, including by:

- Failing to exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect the PII of Plaintiff and Class Members;

- Failing to comply with industry standard data security measures for the financial industry leading up to the Data Breach;

- Failing to comply with their own privacy policies;

- Failing to comply with regulations protecting the PII at issue during the period of the Data Breach;

- Failing to adequately monitor, evaluate, and ensure the security of Defendant's network and systems; and

- Failing to recognize in a timely manner that PII had been compromised.

193.    Defendant also had a duty to Plaintiff and the Class under the FTC Act.

194.    The FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC.

195.    Pursuant to the FTC Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate data security practices to safeguard Plaintiff's and Class Members' PII.

196.    The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

197.    Plaintiff and Class Members were within the class of persons the Federal Trade Commission Act was intended to protect.

198.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and Class Members.

199.    Defendant has admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons, and released on the dark web, as a result of the Data Breach.

200.    Plaintiff further believes her PII and that of Class Members was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyberattacks of this type.

201.    Defendant therefore breached its duty to Plaintiff and the Class by violating Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein.

202.    Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

203.    Defendant acted with wanton disregard for the security of Plaintiff's and Class Members' PII. Defendant knew or reasonably should have known that it had inadequate data security practices to safeguard such information, and Defendant knew or should have known that data thieves were attempting to access databases containing PII such as that entrusted to Defendant.

204.    Plaintiff's and Class Members' PII would not have been compromised but for Defendant's wrongful and negligent breach of their duties.

205.    But for Defendant's wrongful and negligent breaches of the duties owed to Plaintiff and the Class Members, Plaintiff and the Class Members would not have been injured.

206.    Defendant's failure to take proper security measures to protect the PII of Plaintiff and Class Members as described in this Complaint, created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access and copying of PII by unauthorized third parties. Given that financial institutions and their affiliates are prime targets for hackers, Plaintiff and Class Members are part of a foreseeable, discernible group that was at high risk of having their PII misused or disclosed if not adequately protected by Defendant.

207.    It was also foreseeable that Defendants' failure to provide timely and forthright notice of the Data Breach would result in injury to Plaintiff and Class Members.

52

208.     As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have and will suffer damages in an amount to be proven at trial, including: (i) the loss of rental or use value of their PII; (ii) the unconsented disclosure of their Private Information to unauthorized third parties; (iii) out-of- pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their PII; (iv) lost opportunity costs associated with addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from fraud and identity theft; (v) time, effort, and expense associated with placing fraud alerts or freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect it; (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information for the rest of their lives; and (ix) any nominal damages that may be awarded.

## COUNT II
### Breach of Third-Party Beneficiary Contract
### *(On Behalf of Plaintiff and the Class)*

209.     Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 178 as though fully set forth herein.

210.     Acting in the ordinary course of business, Defendant entered into various contracts with its customers, including fintech companies, to provide services to its customers and end users.

211.    Upon information and believe, these contracts are virtually identical to each other.

212.    Upon information and belief, each of those respective contracts contained provisions requiring Defendant to protect the PII that Defendant received in carrying out the business of the contract.

213.    Upon information and belief, these provisions requiring Defendant acting in the ordinary course of business to protect the PII it collected were intentionally included for the direct benefit of Plaintiff and Class Members, as it was their confidential information that Defendant agreed to collect and protect through its services. Thus, the benefit of collection and protection of the PII belonging to Plaintiff and the Class were the direct and primary objective of the contracting parties, such that Plaintiff and Class Members are intended third party beneficiaries of these contracts, and therefore entitled to enforce them.

214.    Defendant knew that if it were to breach these contracts with its fintech company customers, the end users, including Plaintiff and the Class Members, would be harmed.

215.    Defendant breached these contracts while acting in the ordinary course of business by failing to utilize adequate data security practices to safeguard Plaintiff's and Class Members' PII, and by otherwise not protecting Plaintiff's and Class Members' PII, as stated herein.

216.    Plaintiff and Class Members were harmed by Defendant's breaches in failing to use reasonable data security measures to safely maintain and protect Plaintiff's and Class Members' PII.

217.    As a direct and proximate result of Defendant's breaches, Plaintiff and Class Members sustained actual losses and damages described in detail herein, in an amount to be proven at trial. Plaintiff and Class Members alternatively seek an award of nominal damages.

## COUNT III
### Unjust Enrichment
#### *(On Behalf of Plaintiff and the Class)*

218.     Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 178 as though fully set forth herein.

219.     This Count is pleaded in the alternative to the breach of third-party beneficiary contract claim above (Count II).

220.     Plaintiff and Class Members have an interest, both equitable and legal, in their PII that was conferred upon, collected by, and maintained by the Defendant and which was stolen in the Data Breach. This information has independent value.

221.     Plaintiff and Class Members conferred a monetary benefit on Defendant in the form of providing their PII to Defendant, which Defendant then used for its business purposes, including to facilitate the delivery of financial services by Defendant, and also to serve Defendant's business interests and generate profits, including the selling and sharing of the PII it collects and maintains to third parties.

222.     Defendant appreciated and had knowledge of the benefits conferred upon it by Plaintiff and Class Members.

223.     Defendant has accepted and retained benefit conferred upon it by Plaintiff and Class Members by accepting and retaining the PII entrusted to it. Defendant profited from Plaintiff's and Class Members' retained data and used Plaintiff's and Class Members' PII for business purposes and for its own financial gain.

224.     In exchange for receiving Plaintiff's and Class Members' valuable PII, which Defendant was able to use for its own business purposes and which provided actual value to

Defendant, Defendant was obligated to devote sufficient resources to reasonable data privacy and security practices and procedures.

225.     As a result of Defendant's conduct, Plaintiff and Class Members suffered actual damages as described herein.

226.     Under principals of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members because Defendant failed to implement – or adequately implement – the data privacy and security practices that Plaintiff and Class Members paid for and that were otherwise mandated by federal, state, and local laws, and industry standards.

227.     Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds they received from Plaintiff and Class Members, including damages equaling the difference in value between financial services that included implementation of reasonable data privacy and security practices and the services without reasonable data privacy and security practices that they actually received.

228.     A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendant traceable to Plaintiff and Class Members.

## COUNT IV
### Declaratory Judgment
#### *(On Behalf of Plaintiff and the Class)*

229.     Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 178 as though fully set forth herein.

230.     Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant

further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statutes described in this Complaint.

231. An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective common law and other duties to reasonably safeguard PII and whether Defendant are currently maintaining data security measures adequate to protect Plaintiff and Class Members from further cyberattacks and data breaches that could compromise their PII.

232. Defendant still possesses PII pertaining to Plaintiff and Class Members, which means their PII remains at risk of further breaches because Defendant's data security measures remain inadequate. Plaintiff and Class Members continue to suffer injuries as a result of the compromise of their PII and remain at an imminent risk that additional compromises of their PII will occur in the future.

233. Pursuant to the Declaratory Judgment Act, Plaintiff seeks a declaration that: (a) Defendant's existing data security measures do not comply with their obligations and duties of care; and (b) in order to comply with their obligations and duties of care, (1) Defendant must have policies and procedures in place to ensure the parties with whom Defendant share sensitive personal information maintain reasonable, industry-standard security measures, including, but not limited to, those listed at (ii), (a)-(i), *infra*, and must comply with those policies and procedures; (2) Defendant must: (i) purge, delete, or destroy in a reasonably secure manner Plaintiff's and Class Members' PII if it is no longer necessary to perform essential business functions so that it is not subject to further theft; and (ii) implement and maintain reasonable, industry-standard security measures, including, but not limited to:

a. Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b. Engaging third-party security auditors and internal personnel to run automated security monitoring;

c. Auditing, testing, and training their security personnel regarding any new or modified procedures;

d. Encrypting PII and segmenting PII by, among other things, creating firewalls and access controls so that if one area of Defendant's systems is compromised, hackers cannot gain access to other portions of their systems;

e. Purging, deleting, and destroying in a reasonable and secure manner PII not necessary to perform essential business functions;

f. Conducting regular database scanning and security checks;

g. Conducting regular employee education regarding best security practices;

h. Implementing multi-factor authentication and POLP to combat system-wide cyberattacks; and

i. Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

58

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class set forth herein, respectfully requests the following relief:

A.     That the Court certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiff is the proper class representative; and appoint Plaintiff's counsel as Class Counsel;

B.     That the Court grant permanent injunctive relief to prohibit and prevent Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein;

C.     That the Court award Plaintiff and Class Members compensatory, consequential, and general damages, including nominal damages as appropriate, for each count as allowed by law in an amount to be determined at trial;

D.     That the Court award punitive or exemplary damages, to the extent permitted by law;

E.     That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendant as a result of their unlawful acts, omissions, and practices;

F.     That Plaintiff be granted the declaratory and injunctive relief sought herein;

G.     That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses; and

H.     That the Court award pre-and post-judgment interest at the maximum legal rate and all such other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial in the instant action.

59

Dated: September 20, 2024                    Respectfully submitted,

Randall K. Pulliam (ABN #98105)
Joseph Henry (Hank) Bates, III (ABN #98063)
**CARNEY BATES & PULLIAM, PLLC**
One Allied Drive, Suite 1400
Little Rock, Arkansas 72202
Tel.: (501) 312-8500
rpulliam@cbplaw.com
hbates@cbplaw.com

**DiCELLO LEVITT LLP**
Nada Djordjevic (*pro hac vice* forthcoming)
Ten North Dearborn St., Sixth Floor
Chicago, Illinois 60602
Tel.: (312) 214-7900
ndjordjevic@dicellolevitt.com

**POGUST GOODHEAD LLC**
Joshua Neuman (*pro hac vice* forthcoming)
Eight Tower Bridge
161 Washington St Suite 250
Conshohocken, PA 19428
Tel.: (610) 941-4204
jneuman@pogustgoodhead.com

*Counsel for Plaintiff and the Proposed Class*